# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**MARQUITOS MAURICE WHITELAW,**
        **Plaintiff,**

v.                                                 Case No. 19-C-0051

**DR. HORTON, et al.**
        **Defendants.**

## ORDER

Plaintiff Marquitos Maurice Whitelaw, a Wisconsin state prisoner who is representing himself, filed a civil rights complaint under 42 U.S.C. § 1983. I allowed him to proceed on a claim under the Fourteenth Amendment's Due Process Clause against defendants Alyssa Sekadlo, Charles Dombeck, Dawn Morrison, and Mai Bruno ("the nurse defendants") and Dr. Karen Horton for allegedly treating his medical needs with objective unreasonableness. I also have supplemental jurisdiction over a state law medical malpractice claim against all defendants. Before me now are the nurse defendants' motion for summary judgment and Dr. Horton's motion for summary judgment.

## I.    BACKGROUND

### A. The Parties

At the time he broke his hand in July 2018, plaintiff was a pre-trial detainee at the Milwaukee County House of Corrections ("HOC"). ECF No. 93 at ¶ 6. He was convicted on August 8, 2018, and transferred to the Milwaukee County Jail that same day. *Id.* at ¶¶ 7-8. Defendants Charles Dombeck and Alyssa Sekadlo were Advanced Practice Nurse

Prescribers at the HOC, and defendant Dawn Morrison was a registered nurse at the HOC. ECF No. 90 at ¶¶ 11, 16, and 20. Mai Bruno was a registered nurse at the Milwaukee County Jail. *Id.* at ¶ 31. Defendant Dr. Karen Horton was employed by Armor Correctional Medical Services, Inc. as the Medical Director at the Milwaukee County Jail. ECF No. 93 at ¶ 3.

### B. Treatment Provided by the Nurse Defendants

On the evening of July 13, 2018, plaintiff injured his hand after he slipped and fell in the shower. ECF No. 89-9 at 6; Dep. Tr. 16:5-9. His hand swelled "to the size of a boxing glove." ECF No. 90 at ¶ 6. At approximately 1:00 a.m. the morning of July 13, 2018, plaintiff was examined by RN Kieanna Alderson, who is not a defendant[1]. *Id.* at ¶ 8. Alderson noted that plaintiff fell around 6:00 p.m. on July 12 and that his hand began to swell approximately three hours later. *Id.* As a result of her examination, she ordered an x-ray, prescribed acetaminophen, and made an appointment for plaintiff to see either a doctor or a nurse practitioner for evaluation. *Id.*

Plaintiff then saw defendant APNP Dombeck later in the day on July 13. *Id.* at ¶ 11. Plaintiff explained to Dombeck that he was in pain, and Dombeck observed significant swelling near the ring and pinky finger of plaintiff's right hand. *Id.* at ¶ 12. Dombeck states that he ordered an x-ray, prescribed ibuprofen twice a day, acetaminophen twice a day and an ACE bandage. *Id.* at ¶ 13. Dombeck told plaintiff to rest his hand, keep it elevated,

---

[1] Plaintiff attempted to amend his complaint to add RN Alderson after he discovered in his deposition that he erroneously identified Charles Dombeck as the John Doe nurse he saw early in the morning of July 13, 2018. Magistrate Judge Nancy Joseph, after holding a hearing, denied his motion to amend the complaint, finding that the defendants would be unduly prejudiced by the amendment. *See* ECF No. 85.

and keep it wrapped during the day. *Id.* He also set a follow-up appointment for a week later. *Id.* Plaintiff disputes that Dombeck ordered an x-ray or gave him an ACE bandage. ECF No. 99 at ¶ 13.

The medical records show that Dombeck did order an x-ray and that plaintiff had an x-ray on July 13, 2018. ECF No. 90 at ¶ 15; ECF No. 89-7 at 16. The x-ray confirmed "an acute fracture of the distal fifth metacarpal of the right hand." *Id.* In other words, according to the American Academy of Orthopedic Surgeons, he broke his hand, specifically the bone in his palm that supports the pinky finger. *See* https://orthoinfo.aaos.org/en/diseases--conditions/hand-fractures. Defendants state that because of the swelling, "[a]ppropriate treatment of a metacarpal fracture with soft tissue swelling is elevation and rest to allow the swelling to subside and ibuprofen and/or acetaminophen for pain." ECF No. 90 at ¶ 57. According to defendants, this is why plaintiff was not placed in a cast until the middle of August. *Id.* Plaintiff asserts that the five-week delay in receiving a cast was inappropriate. ECF No. 99 at ¶ 14.

On July 15, 2018, defendant RN Morrison completed a Special Needs Consideration/Relocation form, permitting plaintiff to be housed in a lower bunk for one week. ECF No. 90 at ¶ 16. It is undisputed that Morrison was not asked to examine or treat plaintiff or had any obligation to provide medical care. *Id.* at ¶¶ 16-17.; ECF No. 99 at ¶¶ 16-21. In fact, she did not have any contact with plaintiff. Her only role was to fill out the form. *Id.* Plaintiff contends that based off her knowledge of his situation, Morrison should have sent him to the hospital, given him stronger pain medication, or put him in a cast. ECF No. 90 at ¶ 18. Morrison states that under Wisconsin state regulations, she is

3

Case 2:19-cv-00051-LA   Filed 10/15/20   Page 3 of 16   Document 113

not permitted, as a registered nurse, to administer pain medication, send a patient to a hospital, or put a patient in a cast. *Id.* at ¶ 19.

Defendant APNP Sekadlo then examined plaintiff on July 23, 2018. ECF No. 90 at ¶ 20 At that appointment, plaintiff complained of constant and "throbbing pain," rating it an 8/10, though he denied "numbness, tingling, and decreased sensation" in his hand. ECF No. 89-7 at 2-3. Sekadlo also noted that plaintiff had "mid-moderate swelling." *Id.* at 3. Sekadlo decided to refer plaintiff to a hand specialist and continued to prescribe ibuprofen and acetaminophen to address plaintiff's pain. ECF No. 90 at ¶ 24. Plaintiff contends that Sekadlo should have given him stronger pain medication. *Id.* at ¶ 29. Sekadlo states in her affidavit that "narcotic pain medication for non-complicated, closed fractures" such as plaintiff's is not required. ECF No. 89-3 at ¶ 8. At the appointment, she also advised plaintiff to avoid activities that aggravated his pain, to elevate his hand while resting, and to notify staff if his symptoms worsened. ECF No. 89-7 at 3. Additionally, according to her affidavit, she decided not to splint or cast on July 23, 2018, because of "potential for neurologic injury and/or compartment syndrome" caused by the persistent swelling. ECF No. 89-3 at ¶ 5

Plaintiff contends that the specialist's appointment was set too far in the future and he should have been seen immediately. ECF No. 99 at ¶¶ 12-13. Sekadlo states that while she initiated the referral to the hand specialist, she was not involved in setting the appointments. ECF No. 90 at ¶ 25, 58. According to Sekadlo, once a referral is initiated, the specialist is given a copy of the patient's medical record to "assess the appropriateness and timing of the referral." ECF No. 89-3 at ¶ 9. If the outside specialist finds the referral appropriate, the specialist's office then sets the date for the appointment.

4

*Id.* Plaintiff does not dispute that Sekadlo was not responsible for setting outside appointments but also admits that he does not know who was responsible. ECF No. 99 at ¶ 25. Sekadlo also states that an appointment with the hand specialist "was not indicated until resolution of the swelling." ECF No. 89-3 at ¶ 13. Sekadlo uses the word "indicated" in a way that is unique to the medical profession. Accordingly, I will infer from context that she means the appointment would not be necessary or useful until the swelling subsided.

Plaintiff saw the specialist, Dr. Andersen, who is not a defendant, on August 15, 2018. ECF No. 90 at ¶ 15. On the morning of August 15, prior to seeing the specialist, he was examined by defendant RN Bruno. *Id.* at ¶ 31. At the examination, plaintiff "reported swelling and pain in his right fifth metacarpal with limited range of motion and deformity. He reported he was not able to work out, do pushups, or write." ECF 89-5 at ¶ 7. Plaintiff rated his pain at seven out of ten. ECF No. 90 at ¶ 33. Bruno confirmed the swelling, tenderness, and limited range of motion and gave plaintiff acetaminophen. ECF 89-5 at ¶ 9. She also showed him some exercises to address the limited mobility of his hand and instructed him to immobilize his hand. *Id.* Plaintiff contends that Bruno could have given him stronger pain medication or put him in a splint or cast. ECF No. 90 at ¶ 35. At his deposition, plaintiff testified that Bruno could have "done something to make the situation a little better." *Id.* Bruno asserts that Wisconsin state regulations prohibited her from administering stronger drugs or applying a split or cast. ECF No. 89-5 at ¶ 10. She also was aware that plaintiff was seeing Dr. Andersen that same day. ECF No. 90 at ¶ 34.

5

### C. Plaintiff's Appointment with Dr. Andersen

After taking an x-ray and examining plaintiff on August 15, 2018, Dr. Anderson determined that plaintiff's hand was stable and healing. ECF No. 90 at ¶ 39. He recommended that plaintiff continue taking ibuprofen for pain but did not prescribe any additional or stronger pain medication to plaintiff. *Id.* at ¶ 40. He also put plaintiff in "a short arm ulnar gutter cast." *Id.* at ¶ 38. Plaintiff had a follow up with Dr. Andersen on September 5, 2018, where he had another x-ray. *Id.* at ¶¶ 45-46. Dr. Anderson determined that plaintiff's hand was "healing well," and there did not appear to be complications. *Id.* at ¶ 46. Dr. Andersen observed "mild stiffness at the joint and no tenderness at the fracture site." *Id.* at ¶ 45. He removed plaintiff's cast and recommended that plaintiff's fourth and fifth fingers be tapped together. *Id.* at ¶ 47.

### D. Plaintiff's Care After September 5, 2018

Plaintiff was examined by RN Taylor, not a defendant, on September 12, 2018, and complained of constant pain. *Id.* at ¶ 49. Plaintiff does not dispute that Taylor determined that plaintiff had "full range of motion in his hand; ability to ball his hand into a fist, extend his fingers, and perform finger-to-thumb movements without difficulty." *Id.* At 11:00 p.m. the next day, plaintiff was examined by NP Adams, who is not a defendant. *Id.* at ¶ 50. Plaintiff does not dispute that Adams observed that he could make a fist and had a full range of motion. *Id.* Adams ordered an x-ray to rule out the possibility of plaintiff's hand being re-injured. *Id.* at ¶ 51. The x-ray showed the fracture was still present, but it was healing. *Id.*

In his complaint, plaintiff alleged that the dealing with his hand injury caused him to be stressed out, depressed, and have suicidal thoughts. ECF No. 1 at 6. He further

6

alleged that on September 13, 2018, the pain in his hand was so bad that he attempted suicide by jumping off a second story tier of the Milwaukee County Jail. *Id.* at 7. However, in his deposition, plaintiff testified that he did not jump off the tier. ECF No. 89-9 at 27; Dep. Tr. 57: 17-19.

### E. Dr. Horton's Role

Plaintiff states that Dr. Horton was present on July 13, August 2, and August 8, 2018, and she knew that plaintiff had a broken hand. ECF No. 99 at pg. 8, ¶ 7. He contends that, based on her knowledge of his condition, she should have sent him to the hospital for treatment. *Id.* Dr. Horton states that she was out of state from July 12 through July 16, 2018. ECF No. 93 at ¶ 10. In his response to Dr. Horton's proposed findings of fact, plaintiff asserts that his medicine administration record proves that Dr. Horton was at the HOC on July 13, 2018 because it shows she denied administering ibuprofen to plaintiff on that date. ECF No. 109-1 at 2. The medicine administration record also shows that Dr. Horton made decisions about pain medication on August 2 and August 8. *Id.* at 1-3. Dr. Horton asserts that "nurses at the Milwaukee County Jail were authorized to administer certain medications under the name of the physician or nurse practitioner providing care to a patient by accessing the patient's electronic medical record and selecting the doctor or nurse practitioner's name. In cases where the nurse did not know the identity of the doctor or nurse providing care to a patient, they could select Dr. Horton's name." ECF No. 110 at ¶ 10.

Plaintiff also asserts that Dr. Horton discontinued acetaminophen and ibuprofen "on occasions causing [plaintiff] to suffer in pain." ECF No. 109 at ¶ 13. A review of plaintiff's medicine administration record does indicate that Dr. Horton discontinued both

7

acetaminophen and ibuprofen, but not always at the same time. ECF No. 109-1 at 1-2. For instance, on July 13, 2018, she denied ibuprofen, but Charles Dombeck had approved distribution of acetaminophen during that period. *Id* at 1-2.

According to Dr. Horton, her primary duty was "to oversee health services at the Milwaukee County Jail and the House of Corrections," and she "was not responsible for supervising or providing training to nursing staff." ECF No. 93 at ¶¶ 4-5. She also never examined or had any discussions with plaintiff regarding his injury. *Id.* at ¶ 15. Plaintiff disputes this, pointing to the "Specialty Service/Consultation Request" dated July 23, 2018 as evidence that Dr. Horton "was aware of and involved by discussion or examination with [plaintiff's] injury to his hand." ECF No. 109 at ¶ 15. However, the document does not mention Dr. Horton and instead shows Dr. Tim Hughes approving Alyssa Sekadlo's request to have plaintiff sent to a specialist. ECF No. 96-3.

## II.     ANALYSIS

At the outset, I must note that plaintiff was convicted during the treatment of his broken hand. Accordingly, for the events that took place before his date of conviction (August 8, 2018), I will apply the Fourteenth Amendment standard of objective unreasonableness, and for the events that took place after his conviction, I will apply the Eighth Amendment standard of deliberate indifference. The claims against Dombeck, Morrison, and Sekadlo, then, will be analyzed under the Fourteenth Amendment standard, and the claim against Bruno will be analyzed under the Eighth Amendment standard. As for Dr. Horton, both standards apply to her because plaintiff's allegations against her span from July 2018 through September 2018.

8

### A. Summary Judgment Standard

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). To survive a motion for summary judgment, a non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in its favor. *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). For the purposes of deciding the motion for summary judgment, I resolve all factual disputes and make all reasonable factual inferences in favor of the non-moving party. *Springer v. Durflinger*, 518 F.3d 479, 483-84 (7th Cir. 2008).

### B. Fourteenth Amendment Objective Reasonableness in Treating Medical Needs as to Dombeck, Morrison, and Sekadlo.

Where a plaintiff was a pretrial detainee at the time of medical treatment, "a standard of objective reasonableness, and not deliberate indifference, governs claims under the Fourteenth Amendment's Due Process Clause for inadequate medical care provided to pretrial detainees." *McCann v. Ogle Cty., Ill.*, 909 F.3d 881, 886 (7th Cir. 2018). "A pretrial detainee 'needed only to show that the defendant's conduct was *objectively* unreasonable,' without any accompanying requirement to demonstrate . . . 'that the defendant was *subjectively* aware that" the conduct was unreasonable. *Id.* (quoting *Miranda v. Cty. of Lake*, 900 F.3d 335, 351 (7th Cir. 2018)). To prevail at summary judgment, then, a plaintiff "must demonstrate that genuine issues of material fact exist on two questions: (1) whether he suffered from an objectively serious medical condition and (2) whether the medical staff's response to it was objectively reasonable." *Williams v. Ortiz*, 937 F.3d 936, 942-943 (7th Cir. 2019) (citations omitted).

Because there is no dispute that plaintiff's broken hand qualifies as an objectively serious medical condition, I will focus my analysis on the second question. In assessing the reasonableness of the defendants' response, the "standard requires courts to focus on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively—without regard to any subjective belief—whether the response was reasonable." *McCann,* 909 F.3d at 866. "Negligence or gross negligence does not meet this standard." *Williams*, 937 F.3d at 942. Also, a plaintiff's disagreement with a provider's course of treatment does not support the conclusion that a course of treatment was objectively unreasonable. *Id.* at 944.

Nothing in the record demonstrates that Dombeck, Morrison, or Sekadlo's treatment of plaintiff was objectively unreasonable. Morrison had no directive to examine the plaintiff or an obligation to take any action other than completing the Special Needs/Relocation form. It was not objectively unreasonable that she did not, on her own initiative, decide to take any additional action such as escalating to a physician or nurse practitioner. Also, per state regulation, she could not authorize that plaintiff be sent to the hospital, give plaintiff pain medicine, or put him in a cast.

The record also shows that Dombeck and Sekadlo diligently examined plaintiff and addressed his needs. Dombeck examined plaintiff the day after his injury and was the second medical professional in 24 hours to see him. He ordered an x-ray, prescribed him ibuprofen and acetaminophen, instructed plaintiff to elevate his hand, and set up a follow-up appointment. Sekadlo, who conducted that follow-up appointment, noted that the swelling and pain persisted and based off those observations referred plaintiff to a hand specialist. She continued plaintiff's prescription for ibuprofen and acetaminophen and

10

gave him advice on how to help his hand heal faster. These types of treatments are "classic example[s] of a matter for medical judgment." *West v. Matz*, 749 Fed. Appx. 103, 104 (7th Cir. 2018) (quoting *Estelle v. Gamble*, 429 U.S. 97, 107 (1976)).

Plaintiff argues that both Dombeck and Sekadlo should have given him something stronger for the pain, put plaintiff in a cast sooner, and had him see a specialist sooner. However, based on the evidence in the record, no reasonable jury could conclude that the defendants' decisions to deny plaintiff stronger pain medications and delay the application of a cast were objectively unreasonable because they could not find that defendants' decisions were grounded in anything other than sound medical reasoning. According to defendants, plaintiff was not given stronger pain medication because, based on their medical knowledge, the type of injury he had did not require narcotics. Also, placing plaintiff in a cast while his hand was so swollen, in defendants' professional opinion, would have aggravated his injury. Other than his personal opinion as a lay person, the plaintiff offers no evidence to counter these reasons and decisions.

As for the delay in seeing the specialist, the defendants did not have any control as to when Dr. Andersen would see plaintiff and deferred to his judgment on the necessary timing. Nurses and Nurse Practitioners are entitled to defer to a physician's judgment unless "it is apparent that the physician's order will likely harm the patient." *Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010). And while plaintiff probably was uncomfortable in the five weeks between injuring his hand and seeing Dr. Andersen, the record, when taking the facts in a light most favorable to the plaintiff, does not demonstrate that the delay aggravated his condition or needlessly prolonged his pain, which is required to demonstrate a constitutional violation. *See Gomez v. Randle*, 680

11

F.3d 859, 865-66 (7th Cir. 2012). In fact, the record shows that plaintiff had access to pain medication to manage his pain and his condition steadily improved over time. Indeed, Dr. Andersen's medical opinion, which is undisputed, shows that plaintiff's hand was healing properly. A reasonable jury could not conclude that Morrison's, Dombeck's, or Sekadlo's treatment of plaintiff was objectively unreasonable. Summary judgment will be granted in their favor.

### C. Eighth Amendment Deliberate Indifference to Medical Needs as to Bruno.

A medical professional violates the Eighth Amendment where she is deliberately indifferent "to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "To state a cause of action, a plaintiff must show (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008). Again, there is no dispute as to whether plaintiff's broken hand was objectively serious, so I turn my attention to whether Bruno was deliberately indifferent.

A plaintiff must allege "that an official *actually* knew of and disregarded a substantial risk of harm. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). The plaintiff also "must show more than mere evidence of malpractice." *Id.* The plaintiff must show that the prison official's choices "were so 'significant a departure from accepted professional standards or practices' that it is questionable whether they actually exercised professional judgment.*" Stallings v. Liping Zhang*, 607 Fed. Appx. 591, 593 (7th Cir. 2015) (quoting *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)).

12

No reasonable jury could conclude that Bruno's treatment of plaintiff amounted to deliberate indifference. Bruno examined plaintiff, and, based on her observations, continued plaintiff's prescription for acetaminophen and worked with plaintiff on some exercises that would address his limited mobility. Plaintiff contends that Bruno "could have done something to make the situation a little better," and given him stronger pain medication or put him in a cast. ECF No. 90 at ¶ 35. As with the other nursing defendants, plaintiff is merely disagreeing with Bruno's course of treatment and there is no evidence in the record that her treatment decisions were a significant departure from the accepted professional standards or practices. Summary judgment is granted in Bruno's favor.

### D. Fourteenth and Eighth Amendment Claims Against Dr. Horton.

Plaintiff alleges that Dr. Horton was aware on July 13, August 2, and August 8, 2018 that plaintiff needed medical attention for his hand. He contends she should have overridden the treatment decisions of the nurse defendants and sent him to the hospital. The July 13 and August 2 instances fall under the broader Fourteenth Amendment objective reasonableness standard whereas, because plaintiff was convicted on August 8, the August 8 instance falls under the Eighth Amendment deliberate indifference standard.

For all three instances, there is a dispute as to whether Dr. Horton actually knew about plaintiff's injury and whether she had supervisory authority over the nurse defendants. There is also a dispute applicable only to July 13 as to whether Dr. Horton was in the state that day. These questions of fact are ultimately immaterial, because, when construing the evidence in the light most favorable to plaintiff—that Dr. Horton knew the details of his injuries, that she had supervisory authority over the nurse defendants,

13

and that she was in the state on July 13—her decision to implicitly approve the nurse defendants' treatment plans by not changing them is objectively reasonable. Also, as a supervisor, Dr. Horton could only be held liable for the nurse defendants' actions if they were a constitutional violation that she knew about and did nothing to prevent. *See Hildebrant v. Ill. Dep't of Nat. Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003). As discussed above, none of the nurse defendants committed a constitutional violation against plaintiff, so no reasonable jury could conclude that she should be held liable as their supervisor.

Plaintiff also contends that Dr. Horton was objectively unreasonable (or deliberately indifferent for instances after August 8) in discontinuing prescriptions for acetaminophen and ibuprofen, depriving him of pain management. However, the record demonstrates that plaintiff had consistent access to pain medicine through September 13, 2018. While the medicine administration record does show disruptions, often times, access to ibuprofen is denied because plaintiff already had access to acetaminophen. Also, the plaintiff does not dispute that he was prescribed either acetaminophen and/or ibuprofen after examination by the nurse defendants, Dr. Andersen, and the non-defendant nurses. When the medicine administration record is combined with the undisputed treatment plans that included prescriptions for pain medications, it is clear plaintiff had consistent access to pain medication throughout the relevant time period.

And even if Dr. Horton had refused pain medication to the point where plaintiff went for periods without, plaintiff has offered no evidence that her decision was objectively unreasonable. At best, allowing a lapse in pain medication would amount to negligence. There is no evidence on the record that the apparent lapses in the medicine administration record were done purposefully or even recklessly. Also, it is undisputed that plaintiff was

14

provided treatment other than pain medicine to mitigate his pain and help heal his injury, such as teaching him exercises to improve mobility, directing him to elevate his hand, and advising him to rest his hand. Considering the totality of the circumstances surrounding Dr. Horton's role, no reasonable jury could conclude that her actions were objectively unreasonable or deliberately indifferent to plaintiff's medical needs. Summary judgment will be granted in Dr. Horton's favor.

### E. State Law Medical Malpractice Claim

At screening, I exercised supplemental jurisdiction over plaintiff's medical malpractice claim under Wisconsin state law. Now that I have granted summary judgment in favor of defendants and dismissed the federal claims, I decline to continue to exercise that jurisdiction. *See* 28 U.S.C. §1367(c); *Bailey v. City of Chicago*, 779 F.3d 689, 696 (7th Cir. 2015).

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the nurse defendants' motion for summary judgment (ECF No. 87) and Dr. Horton's motion for summary judgment (ECF No. 91) are **GRANTED.** The Clerk of Court shall enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin this 15th day of October, 2020.

s/Lynn Adelman<br>
LYNN ADELMAN<br>
United States District Judge